IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Magistrate Judge Boyd N. Boland

Civil Action No. 13-cv-00398-MSK-BNB

JOSEPH ROSANIA, as Chapter 7 Trustee for the Bankruptcy Estate of Springbok Services, Inc.,

Plaintiff,

v.

GROUP O, INC., an Illinois corporation, and
MURAD VELANI, an individual,

Defendants.

_____

**ORDER**
_____

This matter arises on **Group O's Motion to Compel Production of Accounting Documents** [Doc. # 58, filed 1/9/2014] (the "Motion to Compel"). I heard argument on the Motion to Compel on February 13, 2014, and took it under advisement. The Motion to Compel [Doc. # 58] is DENIED.

This action is brought by Joseph Rosania as Chapter 7 Trustee for the Bankruptcy Estate of Springbok Services, Inc. The Trustee asserts Springbok's claims against Group O and its president, Murad Velani.[1]

Group O alleges that it provides to its clients prepaid rebate and incentive card programs, as follows:

> In general, the prepaid card programs are initiated when a client
> provides to Group O the names of individual customers to whom

---

[1] The Trustee asserts claims for breach of contract, breach of the implied duty of good faith and fair dealing, breach of fiduciary duties against Velani, aiding and abetting breach of fiduciary duties, conspiracy, and exemplary damages. Amended Complaint [Doc. # 71].

> prepaid cards should be sent and in what amount the cards should be loaded. The Group O client pays Group O for the amounts to be loaded onto the cards, fees for the cards, and ancillary services. Group O provides the load funds and the names and amounts to a card supplier to prepare, authorize, and load the cards and send them directly to the clients' customers for personal use.

Amended Complaint [Doc. # 71] at ¶10.

On June 1, 2008, Springbok and Group O entered into the Springbok Services, Inc. Prepaid Services Agreement [Doc. # 3-1] (the "Agreement"). Under the Agreement, Springbok served as card supplier and processor for Group O from June 1, 2008, until the Agreement was terminated on December 30, 2009. Amended Complaint [Doc. # 71] at ¶¶11, 63. Springbok alleges that Group O breached the Agreement by terminating it early and based solely on Springbok's "precarious" financial condition. Id. at ¶¶48-57.

Group O, by contrast, asserts that it terminated the Agreement based on Springbok's "severely flawed" performance:

> (i) Springbok failed to timely remit monies owed to Group O for "breakage" and "slippage" on the Qwest program, with such failures having grown in excess of 2.2 million dollars at the time of Springbok's bankruptcy; (ii) recurring Springbok system failures and downtime; (iii) numerous complaints from both AT&T and Qwest customers that when an activated card was being used at a merchant they were receiving insufficient fund responses, when the card should have had funds available; (iv) failures of the Springbok interactive voice response (IVR) system; and (v) extensive operations problems including inability to handle call volume, inaccurate funding of card values, and failure of cards to accept transactions.
>
> On October 1, 2009, Group O received Springbok's August 14, 2009 Independent Auditor's Report prepared by Anton Collins Mitchell LLP for the period ended December 31, 2008. That audit stated the following problems:
>
> "The Company receives customer prepayment in advance of the

> issuance of cards in connection with the Company's pre-paid card program. The Company utilizes customer prepayments to fund its ongoing operations. To the extent there was significant cancellation by customers, the Company would have to obtain additional funding to repay customer prepayments."
>
> Until receipt of this audit report, Group O was unaware that Springbok was funding its operating deficits with customer deposits intended to fund the cards being issued by Springbok. The audited financial statement further revealed that Springbok had a cumulative operating deficit of $24,924,693, and as a result had a total stockholders' deficit (i.e., negative net worth) of $8,889,922. Given this shocking information, Group O took all appropriate steps to prevent Springbok's wrongful misuse of funds which Group O was paying to Springbok for the issuance of prepaid debit cards for Qwest and AT&T customers; nothing in the Agreement allowed Springbok to use such funds for Springbok's operating deficits, and Springbok breached the Agreement by so using such funds.

Scheduling Order [Doc. # 23] at pp. 4-5.

Group O served a subpoena on Springbok's accountants, Anton Collins Mitchell, commanding the production of "[a]ll communications (including email) exchanged between Springbok and Anton Collins Mitchell" and "[a]ll documents received from or provided to Anton Collins Mitchell . . . from Springbok" on or after January 1, 2008; and "all documents and communications (including email) in [Anton Collins Mitchell's] possession related to work undertaken by Anton Collins Mitchell that was done in the preparation of Springbok's Audited Financial Statements for the year ended December 31, 2008." Subpoena [Doc. # 58-2].

Many documents were produced in response to the commands of the subpoena. The Trustee has asserted the accountant-client privilege with respect to 22 documents, however. In connection with asserting the privilege, the Trustee prepared a Privilege Log listing nine categories of documents withheld; providing a summary of the subject matter of the withheld

materials; identifying the author; and asserting the accountant-client privilege. All of the withheld documents are described as "[a]ccountant's working papers"; generally, the author is identified as Anton Collins Mitchell; and none of the withheld documents are identified by Bates number. Greater information is contained in the subject description, however, which includes the following:

| | | |
|---|---|---|
| Category 1: | "ACM's responsibility in accordance with AU 341.02 and AU 341.05"; |
| Category 2: | "Summary of payment card network rules and regulations and BIN sponsor agreement requirements with respect to cardholder funds"; |
| Category 3: | "Audit planning memo re 12/31/2008 audit prepared for management, board of directors, and audit committee"; |
| Category 4: | "Note to audit file re SAS 112 and 114 letters to be provided to management"; |
| Category 5: | "Letter to Springbok management and board of directors re status of 2007 audit"; |
| Category 6: | "Letter re opinion whether financial statements present fairly, in all material respects, the financial position, results of operations, and cash flows of Springbok in conformity with accounting principles generally accepted in the United States"; |
| Category 7: | "Signed letter re opinion whether the financial statements present fairly, in all material respects, the financial position, results of operations, and cash flows of Springbok in conformity with accounting principles generally accepted in the United States"; |
| Category 8: | "Memo regarding audit planning meeting agenda for March 5, 2009 meeting"; and |
| Category 9: | "List of working papers redacting entries." |

Privilege Log [Doc. 58-4].

Additional identifying information has been provided by Anton Collins Mitchell in its Response to the motion to compel [Doc. # 63]. There, the accounting firm describes each of the 22 withheld documents individually:

1. COMM-1 Pre-Audit Communication

2. COMM-2 Springbok Services Management Letter Memo

3. COMM-4 Board Letter Re-2007 Audit Issues

4. I - Springbok 2008 Management Rep Letter - FINAL

5. I-1 - Springbok 2008 Rep Letter - Signed

6. KK - Unused Card Balances

7. KK MEMO Unused Gift Card Liability Testing Memo

8. KK-1 Unused Card Liability Rollforward 12-31-08

9. KK-2 Load Testing Tie-out to Unused

10. KK-4 2008 Deferred Revenue

11. KK-4.1 Deferred Revenue Testing

12. KK-5 Spend Testing

13. MRC-2 Springbok 2008 Going concern memo

14. MRC2.1 - Memo to File Regarding Cardholder Funds

15. QQ Customer Deposits

16. QQ-1 Customer Deposits

17. X - Springbok Planning Memo

18. X-2 Preliminary Estimate of Materiality

    19.  X-3 Preliminary Analytical Review

    20.  KK-2.1 Load activity testing selections - FY 2008 (IDEA Random Sample)

    21.  KK-5.1 Spending Activity Sample (Jan-Jun)

    22.  KK-5.2 Spend Activity Sample (Jul-Dec).

Id. at p. 3.

  First, I find that the accounting records are relevant to the parties' claims and defenses or are reasonably calculated to lead to the discovery of admissible evidence. Specifically, the materials are relevant to the Trustee's damages claims, and particularly to the issue of whether Springbok could have stayed in business even if Group O had not terminated the Agreement. In addition, the materials are relevant to Group O's defense that Springbok was misusing customer funds to meet its operating deficits.[2]

  In its Motion to Compel [Doc. # 58], Group O appears to accept the Trustee's assertion that the materials are subject to the Colorado accountant-client privilege and argues only that the accountant-client privilege has been waived under the "at-issue" doctrine. Id. at Part II. Subsequently in its Reply [Doc. # 66], however, Group O shifts gears and argues that "many of these documents do not appear to include privileged information in the first instance" but, instead, "appear to contain basic accounting information." Id. at pp. 3-4.

  Jurisdiction here is based on diversity of citizenship. Notice of Removal [Doc. # 1] at ¶4. "In a civil action based upon a state cause of action, state law controls the determination of

---

[2]According to Group O, "[n]either ACM nor [the Trustee] has objected to the subpoena in this case on any grounds other than the assertion of the accountant-client privilege. Therefore, that is the only issue before the Court." Motion to Compel [Doc. # 58] at p. 3.

privileges." White v. American Airlines, Inc., 915 F.2d 1414, 1424 (10th Cir. 1990). Consequently, I look to Colorado state law in resolving the privilege issues raised in the Motion to Compel.

Colorado has enacted a statutory accountant-client privilege, as follows:

> (1) There are particular relations in which it is the policy of the law to encourage confidences and to preserve it inviolate; therefore, a person shall not be examined as a witness in the following cases:
>
> \* \* \*
>
> (f)(I) A certified public accountant shall not be examined without the consent of his or her client as to any communication made by the client to him or her in person or through the media of books of account and financial records or his or her advice, reports, or working papers given or made thereon in the course of professional employment; nor shall a secretary, stenographer, clerk, or assistant of a certified public accountant be examined without the consent of the client concerned concerning any fact, the knowledge of which he or she has acquired in such capacity.

Section 13-90-107(1)(f)(I), C.R.S. Also under Colorado law: (1) "the claimant of a privilege bears the burden of establishing the applicability of the privilege," People v. District Court, 743 P.2d 432, 435 (Colo. 1987); but (2) "[t]he burden of establishing . . . a waiver [of a privilege] rests with the party seeking to overcome the privilege." People v. Madera, 112 P. 3d 688, 690 (Colo. 2005).

By its express terms, the accountant-client privilege protects from disclosure communications by the client to the accountant and the accountant's advice "given or made thereon" as well as the accountant's "working papers." Section 13-90-107(1)(f)(I); accord Weck v. District Court, 408 P.2d 987 (Colo. 1966) (rejecting the argument that the accountant-client privilege does not apply to an accountant's work papers and finding no waiver merely because the "auditor's financial statements and annual reports . . . were distributed to the public and to

the stockholders of the company"). Here, the record makes clear, and I find, that the Trustee has satisfied his initial burden of showing that the disputed documents are among Anton Collins Mitchell's work papers made in the course of its professional employment and are subject to the accountant-client privilege.

The Colorado Supreme Court in <u>Mountain States Telephone and Telegraph Co. v. DiFede</u>, 780 P.2d 533, 543 (Colo. 1989), recognized the at-issue exception to statutory privileges,[3] stating:

> Although we have not directly addressed this issue before, it is clear from our review of cases from other states that by placing in issue a confidential communication going directly to the claim or defense, a party impliedly waives the . . . privilege with respect to that communication.

More recently, in <u>People v. Madera</u>, 112 P.3d 688, 691-92 (Colo. 2005), the Colorado court explained:

> Courts have found implied waiver of the . . . privilege when a defendant places the allegedly privileged communication at issue in the litigation, because any other rule would enable the client to use as a sword the protection which is awarded him as a shield.
> \* \* \*
> [W]e have adopted the following three-prong test for implied [at-issue] waiver of the . . . privilege which asks whether: (1) assertion of the privilege was the result of some affirmative act, such as filing suit, by the asserting party; (2) through this affirmative act, the asserting party put the protected information at issue by making it relevant to the case; and (3) application of the privilege would have denied the opposing party access to information vital to his defense.

---

[3]Each of the cases discussed here--<u>DiFede</u>, <u>Madera</u>, <u>Trujillo</u>, and <u>Galena</u>--involved the attorney-client privilege. The policies underlying that privilege are the same as those involved in the accountant-client privilege, and the rationale for applying the at-issue waiver is the same with respect to both privileges.

(Internal quotation and citation omitted.)  However, the court cautioned against the excessive application of the at-issue waiver and ruled that a party asserting waiver must "show that the privilege exception applies to each document it [seeks] in discovery."  Id. at 690.

And in People v. Trujillo, 144 P.3d 539, 543 (Colo. 2006), the Colorado Supreme Court explained that the at-issue waiver applies "if a client asserts a claim or defense that depends upon privileged information. . . ."  As I explained in Galena Street Fund, L.P. v. Wells Fargo Bank, N.A., 2014 WL 943115 *6 (D. Colo. March 10, 2014):

> At-issue waiver does not occur merely because a client has received . . . advice about a matter.  Such a rule would swallow the . . . privilege.  Instead, at-issue waiver applies only where the claim or defense "depends" on the privileged information.  In other words, a party cannot assert a defense that depends on privileged information and simultaneously use the privilege to keep that information from the opposing party.

Although the communications between the client and its accountants may be relevant to claims or defenses in the case, neither the Trustee's damage theories nor Group O's defense that Springbok was misusing customer funds to meet its operating deficits nor any other claim or defense identified by Group O depends on the communications between or the advice from Anton Collins Mitchell to Springbok.  Consequently, I find that Group O has failed to establish that the accountant-client privilege has been waived.

IT IS ORDERED that the Motion to Compel [Doc. # 58] is DENIED.

Dated March 25, 2014.

                                                BY THE COURT:

                                                s/ Boyd N. Boland
                                                United States Magistrate Judge